**BEATRICE FOODS COMPANY,**
Plaintiff–Appellee,

v.

**NEW ENGLAND PRINTING AND
LITHOGRAPHING COMPANY,**
Defendant–Appellant.

Nos. 88–1574, 88–1575.

United States Court of Appeals,
Federal Circuit.

Feb. 27, 1990.

James B. Muskal, Leydig, Voit & Mayer, Chicago, Ill., argued for plaintiff-appellee.

With him on the brief was Richard M. Johnson.

Theodore W. Anderson, Neuman, Williams, Anderson & Olson, Chicago, Ill., argued for defendant-appellant. With him on the brief were Michael O. Warnecke, Deborah Schavey Ruff and John M. Augustyn.

Before MARKEY, Chief Judge, RICH, Circuit Judge, BENNETT, Senior Circuit Judge, NIES, NEWMAN, ARCHER, MAYER, and MICHEL, Circuit Judges.

PER CURIAM.

In the liability phase this court affirmed the district court's judgment, reported at *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 224 USPQ 982, 1984 WL 1493 (D.Conn.1984), of infringement by New England Printing and Lithographing Co. ("New England") of three United States patents owned by Beatrice Foods (hereinafter "Webcraft", now the independent company Webcraft Technologies, Inc. and the real party in interest). *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 758 F.2d 668 (Fed.Cir.1984) (unpublished). On remand the district court determined that this case had not been proven to be "exceptional" within the meaning of 35 U.S.C. § 285 (1982), and declined to reinstate its earlier award of attorney fees. Order, June 5, 1985. An accounting of damages was ordered.

After extensive discovery and other procedures, a trial of damages was held in March 1988. The district court awarded Webcraft damages for patent infringement in the amount of $22,107,837.69, and prejudgment interest. *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, No. B-80-335 (D.Conn. July 14, 1988). The district court imposed a personal sanction on New England's attorneys under 28 U.S.C. § 1927 (1982) for "multiplying the proceedings unreasonably and vexatiously", Order, filed November 19, 1987, and assessed costs, expenses, and attorney fees incurred by Webcraft, in the amount of $17,754.99. Order, July 20,

1988. New England appeals the damages award and the sanction.

## DAMAGES

### A

■ Damages "adequate to compensate for the infringement", in the words of 35 U.S.C. § 284 (1982), are usually measured, depending on the circumstances and the proof, as the patent owner's lost profits or as a reasonable royalty. *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1326, 5 USPQ2d 1255, 1260 (Fed. Cir.1987). *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 653–54, 225 USPQ 985, 987 (Fed.Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

Citing *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156, 197 USPQ 726, 729 (6th Cir.1978) and *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616, 222 USPQ 654, 663 (Fed.Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984), the district court, in applying Webcraft's lost profits as the measure of damages, found that there was demand for the patented product, that Webcraft had the capability to meet that demand, and that there were no acceptable noninfringing substitutes. The patent owner's burden of proof regarding these elements is one of "reasonable probability." *Kori*, 761 F.2d at 653, 225 USPQ at 987 (citing *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065, 219 USPQ 670, 675 (Fed.Cir.1983)). When the patent holder would reasonably have made the sale, but for the infringement, the award of lost profits is proper. *Kori*, 761 F.2d at 653, 225 USPQ at 987 (citing *Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11 at 21, 223 USPQ 591 at 598, (Fed.Cir.1984) and *Bio–Rad*, 739 F.2d at 616, 222 USPQ at 663).

New England argues that damages should be measured as a reasonable royalty, not lost profits. At the time Webcraft first gave notice of infringement, Webcraft had offered New England a license at an apparently modest royalty rate or a paid-up license, and has since offered and granted royalty-bearing licenses to others. New England argues that Webcraft's offers to license others "where no actual dispute has arisen" is probative of the damages that should be assessed against New England.

■ New England states that the district court refused to receive evidence of licenses offered to and royalties paid by others, that such evidence is admissible, and therefore that the court committed reversible error. However, the question is not whether such evidence is admissible under Rule 408, Federal Rules of Evidence, as New England argues, but whether it was required to be admitted. A trial judge has broad authority to manage the trial and to exclude irrelevant evidence. Further, it appears that New England's expert testified without restraint on the subject of royalties offered to or paid by others.

■ The district court was not required to receive evidence pertinent to a determination of what royalty would be reasonable, when a royalty was correctly held not to be the measure of damages. *Accord, e.g., Greenwood Ranches, Inc. v. Skie Constr. Co.*, 629 F.2d 518, 523 (8th Cir. 1980) (district court's exclusion of testimony on "actual" loss from failure of irrigation system upheld because such proof was not relevant under district court's interpretation of state law).

The court held that the appropriate measure of damages was Webcraft's lost profits due to New England's infringing activity. Although New England argues that Webcraft failed to carry its burden of proof, reversible error has not been shown. We affirm the district court's holding that damages were properly measured by Webcraft's lost profits.

### B

The accounting period covered July 7, 1974 (six years before the commencement of litigation in 1980) through February 1983, when New England ceased infringing activity. The liability phase came to trial in 1983, after extensive pre-trial procedures. In 1983 New England destroyed all of its

manufacturing "job tickets". The "job ticket folders" contained a sample of the job and the press specification sheet which listed the press number, amounts and press counts. This was the primary and for many jobs the only source of information as to what had been manufactured and in what quantity. In response to interrogatories in 1980, New England stated that the job tickets "appear[ed] to be available". In 1981 New England's vice-president of manufacturing averred that by company policy these tickets were maintained for six years. New England also destroyed all invoices for sales prior to 1978, and some for later sales. A "job order" book remained that had entries from 1975. The parties agree that this book, and other remaining records, did not provide complete information either as to the product that was manufactured in each job, or the quantities sold.

Webcraft, carrying the burden of proving damages, attempted to fill the gaps that were due to these incomplete records. Webcraft undertook third party discovery of customers that Webcraft identified, it appears, from accounts that it had lost to New England. Based on purchase orders from such customers' files, Webcraft tried to identify which of the entries in the "job order" book were for infringing goods, and to correlate these entries with invoices or purchase orders.

Before the district court, New England disputed the adequacy of the evidence compiled by Webcraft to show what New England had manufactured, in what quantities, and whether the items manufactured were of infringing structure. Webcraft reports, without contradiction, that New England refused to admit that it "maintained a record of production in job book entries." New England also stated that it was unable to identify its nomenclature in the job book and on its invoices, or which product descriptions applied to infringing products.

New England argued at the accounting trial that the purchase orders that Webcraft had obtained from New England's customers, even those with New England's invoice numbers, were not a correct or probative measure of what had been manufactured and sold by New England. New England argued, and repeats on this appeal, that Webcraft's attempts to reconstruct New England's infringing activities were inadequate to meet Webcraft's burden of proving damages for infringement.

New England also argues on this appeal that the parties "reduced the level of their disagreement to about 3 million out of more than 950 million products sold," and that infringement damages must be limited accordingly. Webcraft replies that there was no agreement as to the total amount of infringement, and that "any threshold agreement reached was only as to the absolute minimum infringing quantities." The record supports Webcraft's position. In response to a request for admissions, New England had replied: "For each request that asks the defendant to admit that a copy of an invoice 'establishes a sale,' the request is denied. An invoice only establishes that an invoice was prepared, it does not establish that the goods were actually made, or shipped, or that any payment was made or received." In response to an interrogatory concerning sales to specific identified customers, New England answered: "Defendant has not yet completed the calculation by which it will formulate a contention in this regard. When and if such a contention has been formulated, this answer will be supplemented". Webcraft states that New England never responded further, despite repeated requests.

This evidence clearly showed that the incompleteness of Webcraft's proof was due to New England's destruction of its job tickets and other records, New England's refusal to admit that its own invoices established a sale or that its customers' purchase orders established a sale, and New England's lack of cooperation and refusals to respond in discovery and other procedures. New England stated before the district court that it had not deliberately destroyed its manufacturing records, that the destruction had been done routinely. The district court received testimony on the issue from New England's witnesses. The court did not believe New England's explanations. We have no basis for disturbing

the district court's credibility determinations, and the court's view that this evidence was deliberately destroyed. *See, Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982) ("Determining the weight and credibility of the evidence is the special province of the trier of fact"); *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1445, 221 USPQ 97, 111 (Fed.Cir. 1984).

New England's procedures were not well received by the district court. In its opinion the court wrote: "The most outrageous is, of course, defendant's intentional destruction of its job tickets, the only yardstick to measure accurately defendant's guilt in dollars, thus hindering plaintiff in proving defendant's illegal use of its patents [sic, inventions]."

## C

The district court held that Webcraft had proved its damages without the need for drawing adverse inferences against New England. The court measured damages by the amount of New England's sales that Webcraft had proven to be infringing, plus certain "convoyed" sales. The court then used this sales figure as Webcraft's lost profits, stating that since New England's sales were illicit, New England was not entitled to deductions from this total. Damages were thus awarded of $22,107,-837.69.

Webcraft states that the district court made an equitable determination of the amount of damages suffered by Webcraft and that, in the absence of hard data due to New England's misfeasances, this discretionary judgment should not be disturbed. Webcraft states that the figure of $22 million in sales was a conservative minimum, in that the job book showed billions of units produced, and that only those jobs that could be compared with invoices or with purchase orders obtained from third persons, and that could reasonably be presumed to be infringements based on the available product descriptions, were counted by Webcraft.

Webcraft cites the example of jobs listed in the job book for National Liberty Insurance, an ex-customer of Webcraft, where no quantities or product descriptions were shown in the job book and the invoices were destroyed by New England, but New England's ledger showed sales for these job numbers of over $281,000. Webcraft calls this an example of "infringing production which escaped the accounting" due to destruction of the probative documents, and argues that the district court was entitled to take such factors into account in reaching an equitable measure of damages.

New England argues that Webcraft is not entitled to the inclusion of "convoyed" sales. Webcraft had identified as "convoyed" certain sales, including sales to ex-customers of Webcraft, for which it lacked proof of infringing structure. The law does not bar the inclusion of convoyed sales, *Paper Converting*, 745 F.2d at 23, 223 USPQ at 599–600, and the district court did not clearly err in including these sales under these circumstances.

New England continues to challenge the probative value of Webcraft's figures; pointing out, for example, that one of the ostensible customers approached by Webcraft turned out to have bought its pamphlets not from New England but from Webcraft's licensee. New England's position appears to be that, absent the possibility of precise measure of actual infringement, damages must be limited to that minimum production as to which there was not substantial disagreement. This was not adopted by the district court. Such an outcome would simply reward New England's actions.

An infringer can not destroy the evidence of the extent of its wrongdoing, and limit its liability to that which it failed to destroy. The uncertainty in the damages calculation is the direct result of New England's procedures. "Fundamental principles of justice require us to throw any risk of uncertainty upon the wrongdoer rather than upon the injured party." *Kori*, 761 F.2d at 655, 225 USPQ at 989 (citing *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563, 51 S.Ct. 248,

251, 75 L.Ed. 544 (1931)). *See also West-inghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.,* 225 U.S. 604, 620, 32 S.Ct. 691, 696, 56 L.Ed. 1222 (1912) (infringer bears the risk where precise calculation impossible); *Computing Scale Co. v. Toledo Computing Scale Co.,* 279 F. 648, 673 (7th Cir.1921), *cert. denied,* 257 U.S. 657, 42 S.Ct. 184, 66 L.Ed. 420 (1922) (a knowing infringer "should be held to the duty of keeping separate and accurate records of all his infringing acts; and, on his failure to keep such records, the court, in measuring the damages on account of his trespasses, should resolve all doubts against him"); *Yesbera v. Hardesty Mfg. Co.,* 166 F. 120, 122 (6th Cir.1908), *cert. denied,* 214 U.S. 513, 29 S.Ct. 696, 53 L.Ed. 1063 (1909) ("failure or refusal to produce the most satisfactory evidence" creates presumption that such evidence is damaging).

■ Substantial discretion is reposed in the trial court when reaching a judgment following lack of cooperation of a party. The trial court may increase damages up to treble the amount of actual damages. *See, e.g., Fox v. Knickerbocker Engraving Co.,* 165 F. 442, 444 (2d Cir.1908) (treble damages upheld where the defendant destroyed its files showing use of the infringing process before the commencement of the accounting, "although this was not done maliciously or for the purposes of concealment"). In *Fox,* the court found that where the defendant's conduct had "subjected the complainants to a long and expensive litigation which might easily have been avoided if a license had been taken, [the lower court, in awarding increased damages] may well have thought that the damages which it was possible to prove were inadequate." *Id.* at 444.

■ New England provided no actual amounts of infringing sales, offered no estimates of infringing sales, did not assist in their reconstruction, and consistently denied the accuracy of Webcraft's evidence. While New England argues that the figure chosen by the court is clearly erroneous, it has not shown that there is better support for any other figure. *Lindemann Maschinenfabrik GmbH v. American Hoist &*

*Derrick Co.,* 895 F.2d 1403 at 1406 (Fed. Cir.1990). We affirm the district court's selection of $22,107,837.69 as New England's infringing sales.

■ However, we can not agree with Webcraft that the district court had equitable discretion to equate New England's gross sales with Webcraft's lost profit damages. The court's stated reason for so doing—that New England as a tortfeasor had no manufacturing costs, does not implement the standard of Webcraft's lost profits that the court had correctly adopted. We vacate the judgment that damages shall be $22,107,837.69, and remand to the district court for the purpose of determining Webcraft's damages on the basis of lost profits. In so doing, the court may give consideration to Webcraft's request that its actual damages be multiplied, as authorized by 35 U.S.C. § 284, and may in its equitable discretion grant said request, whether or not such an award exceeds $22,107,837.69.

Further, we do not decide whether Webcraft is entitled to the elements or quantum of damages asserted in its brief, *viz.* a 35% profit margin, 3% overage on job book entry sales, or loss of freight profits. These aspects are appropriately subject to consideration by the district court on remand.

### SANCTIONS UNDER SECTION 1927

The district court imposed sanctions under 28 U.S.C. § 1927 against New England's attorneys, for "multiplying the proceedings unreasonably and vexatiously." Specifically, the court found that New England's weighty four motions and memoranda filed on August 28, 1987, along with the oppositions and replies generated by the motions, were made for the purpose of delay.

New England protests that these motions were filed concurrently with several motions by Webcraft, in a time frame that had been approved by the court; that the subject matter of the motions was relevant and material because Webcraft filed three motions on the same issues; and that the imposition of a monetary sanction without

prior notice and an opportunity to be heard violates due process.

A trial court has broad discretionary authority in managing the litigation before it, and the deterrence of intentional and unnecessary delay in the proceedings, the ground here cited by the district court, is a principal purpose of 28 U.S.C. § 1927. However, in *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 2465, 65 L.Ed.2d 488 (1980), the Supreme Court stated that "[l]ike other sanctions, attorney's fees certainly should not be assessed … without fair notice and an opportunity for a hearing on the record." *See generally Oliveri v. Thompson,* 803 F.2d 1265, 1280 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987) (requiring "[a]t a minimum, … notice and an opportunity to be heard"). In the present case there was no opportunity for a hearing on the sanction.

Webcraft suggests that New England could have moved under Rule 59(e) for reconsideration of the court's order imposing the sanction, thus obtaining a hearing. Such motions are to be favored under circumstances like the present. They can result in either a withdrawal of the order or a more detailed explication of the district court's reasons for adhering to it. Thus they may eliminate either an appeal from the sanction order or the need for a remand. Nonetheless, reconsideration after a decision is rendered is not a substitute for a pre-decision hearing, when such hearing is otherwise required. *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 787, 28 L.Ed.2d 113 (1971).

In the absence of a hearing or justification for its absence, *see Boddie,* 401 U.S. at 379 & n. 6, 91 S.Ct. at 787 & n. 6, the order imposing sanctions under 28 U.S.C. § 1927 is vacated and the matter is remanded for the conduct of an appropriate hearing.

---

1. The court, *in banc,* holds that its authority to direct assignment of a remanded case to a different district court judge need not be addressed in this case.

## OTHER ISSUES

We have reviewed the issues raised in New England's counter-claim with respect to claim 10 of the '817 patent, including Webcraft's assertion that New England did not press the issue at the liability trial. The district court correctly held that the issue of validity was precluded at the accounting trial, and that the parchment products were properly included in the total infringing sales.

With respect to patent marking and the other issues and arguments raised on appeal, we discern no reversible error.[1]

## COSTS

Each side shall bear its costs.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

PAULINE NEWMAN, Circuit Judge, with whom BENNETT, Senior Circuit Judge, and MAYER, Circuit Judge, join, concurring in the judgment.

On the major issue of this appeal I reach the same conclusion as does the court, for the reasons stated in the *per curiam* opinion. I agree that the damages must be redetermined, and the case remanded to the district court for this purpose. I also concur in the court's implicit conclusion that New England's concern with the trial judge's asserted bias does not warrant the court's taking action on New England's request that the matter be retried and that further proceedings be conducted before a different judge.

I do, however, believe that the issue of judicial bias has been properly raised on this appeal, and that it is not frivolous. Therefore, I address the question of the court's jurisdiction to determine the issue.

The issue of our appellate authority, when judicial bias is asserted, was considered in *Petersen Mfg. Co. v. Central Purchasing, Inc.,* 740 F.2d 1541, 222 USPQ 562 (Fed.Cir.1984). I believe that *Petersen* has been superseded, if not expressly overruled, by decisions of the Federal Circuit *in banc* and the Supreme Court.

In *Petersen* a panel of this court held, in response to an allegation of judicial bias and a request for remand to a different judge:

> [W]e do not sit to judge the character of district court judges. Nor do we have the authority, as counsel asserts, to order assignment of this case to a different judge on remand. Unlike other Circuit Courts of Appeal we have no direct supervisory authority over district courts. Hence, we cannot act on Petersen's request.

740 F.2d at 1552, 222 USPQ at 570 (citations omitted). The panel in *Petersen* did not review the merits of the requested reassignment. Nor did it discuss which court might review the issue in our stead, or the procedural and jurisdictional dilemmas there created.

However, only a few months after the *Petersen* decision, this court took *in banc* action that appeared to resolve the matter. In *Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 223 USPQ 1074 (Fed.Cir.1984) (*in banc*), we affirmed that our exclusive jurisdiction over appeals of cases arising under the patent law requires us to resolve all issues fairly raised on appeal, and not only issues of patent law. We recognized the intent of Congress that formation of the Federal Circuit not impose on parties and courts a new burden of multiple appeals to different tribunals. We observed that bifurcation of appeals between the Federal and a regional circuit, depending on the issue requiring decision, would be "in direct defiance of this intent of Congress". 747 F.2d at 1435, 223 USPQ at 1084. We said that:

> continuing uncertainty [as to the path of appellate jurisdiction] could result in unnecessary disputes, undue costs, and additional mid-process litigation concerning the proper appellate forum for individual claims, for interlocutory appeals, and for writs of mandamus.
>
> A major reason for creating this court was to eliminate such sideline skirmishing.

*Atari,* 747 F.2d at 1435, 223 USPQ at 1084.

In *Atari* the Federal Circuit appeared fully to accept its obligation to decide all issues that require decision on appeals that reach us because of our assigned exclusive jurisdiction. This position has been reinforced by the Supreme Court. In *United States v. Hohri,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987), the Court noted that bifurcation of an appeal based on different "legal claims", in that case a Little Tucker Act claim and a claim under the Federal Tort Claims Act, is "inappropriate." The Court held that both claims must be decided by the Federal Circuit, that our jurisdictional statute so requires. The Court stated:

> The language of [28 U.S.C.] § 1295(a)(2) discusses jurisdiction over an appeal "in a case," not over an appeal from decision of "a claim." This strongly suggests that appeals of different parts of a single case should not go to different courts.... a bifurcated appeal of the different legal claims raised in any one case would result in an inefficient commitment of the limited resources of the federal appellate courts.

482 U.S. at 69 n. 3, 107 S.Ct. at 2250 n. 3 (citing *Atari, supra*). *See also Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 108 S.Ct. 2166, 2173, 100 L.Ed.2d 811, 7 USPQ2d 1109, 1113 (1988) (discussing jurisdiction based on cases arising under the patent law; rejecting bifurcation of appeal based on issues raised in defense).

This unanimous post-*Petersen* authority, that there should not be separate appellate routes depending on the claims or issues of a case, made clear that the Federal Circuit has both the obligation, and the authority, to consider any issue fairly raised in a case properly before us. This is no longer a matter of uncertainty.

Indeed, in *Polaroid Corp. v. Eastman Kodak Co.,* 867 F.2d 1415, 9 USPQ2d 1877 (Fed.Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 1956, 104 L.Ed.2d 425 (1989), we decided the issue of judicial disqualification, for which the requested remedy was vacation of the judge's decision and a new trial before a different judge—the same remedy New England is here requesting. We did

not hint in *Polaroid* that we believed the Federal Circuit was without authority to deal with the issue, as in *Petersen*. Instead, we granted an interlocutory appeal to consider and decide the issue.

Thus *Petersen* has been superseded by practicality and overruled by authority.

I do not denigrate the salutary restraint underlying the ruling in *Petersen* by the young Federal Circuit. But I think it unlikely that the Federal Circuit was intended to have less authority under 28 U.S.C. § 2106 than did the courts that received patent appeals before our formation.[1] While the mechanics of proceedings on remand are not the direct concern of circuit courts, the appellate structure is grounded on the assumption that appellate decisions will be appropriately implemented. The Second Circuit discussed this relationship in *United States v. Yagid*, 528 F.2d 962, 965 (2d Cir.1976), the court stating that the "district court's apprehension that this Court is injecting itself into the assignment process of the district courts is unwarranted." The Second Circuit drew a pragmatic line:

> We did not suggest who *should* preside over the retrial. We suggested who *should not* preside. When we believe that there is an inherent problem in a particular remand, we have the power, indeed the duty, to frame our opinion to provide for "further proceedings ... [which are] just under the circumstances." 28 U.S.C. § 2106. [emphases in original]

*Id.* (footnotes omitted). In *United States v. Clark*, 475 F.2d 240, 251 (2d Cir.1973), the circuit court, ordering a new trial in a criminal case, stated that it would be "advisable" if the hearing were held "before another member of the court", because of the trial judge's prior decision on certain issues. *See also, e.g., Holley v. Lavine*, 553 F.2d 845, 851 (2d Cir.1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1532, 55

L.Ed.2d 545 (1978) (reassignment "advisable to avoid the appearance of prejudgment").

The Second Circuit, whose law we apply to the issue of judicial bias, see *Atari*, 747 F.2d at 1440, 223 USPQ at 1087 (applying "established, discernable law of the involved circuit" to issues not exclusive to the Federal Circuit), discussed the usual procedures with respect to remand for further proceedings in *United States v. Robin*, 553 F.2d 8 (2d Cir.1977) (*per curiam*) (*in banc*):

> As a general rule, cases sent back to a district court for further proceedings are remanded without any directions or suggestions as to the judge before whom they are to be conducted. That matter is properly left to the district court. However, in a few instances there may be unusual circumstances where "both for the judge's sake and the appearance of justice," see *United States v. Schwarz*, 500 F.2d 1350, 1352 (2d Cir.1974), an assignment to a different judge "is salutary and in the public interest, especially as it minimizes even a suspicion of partiality", see *United States v. Simon*, 393 F.2d 90, 91 (2d Cir.1968).

*Id.* at 9–10.

Other circuits have applied reasoning similar to that of *Robin, supra. See, e.g., Bembenista v. United States*, 866 F.2d 493, 499 (D.C.Cir.1989) (considering the issue of judicial bias in the course of an appeal on the merits, and declining the requested remand to a different judge); *United States v. Jacobs*, 855 F.2d 652, 656 & n. 3 (9th Cir.1988) (discussing differences with respect to remand to a different judge under 28 U.S.C. § 2106, § 144, and § 455, and referring to "the court of appeals' traditional power to reassign"); *Bercheny v. Johnson*, 633 F.2d 473, 476–77 (6th Cir. 1980) (applying the *Robin* test in considering remand to a different judge); *Simon v.*

---

1. Appellate remedial authority is stated in 28 U.S.C. § 2106:

   § 2106. The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

**1180**

*City of Clute,* 825 F.2d 940, 943–44 (5th Cir.1987) ("appellate courts consider three factors in deciding whether to remand a case to a different judge"); *United States v. White,* 846 F.2d 678, 695, 696 (11th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 537, 538, 102 L.Ed.2d 568 (1988) ("where a reasonable person would question the trial judge's impartiality, reassignment is appropriate"); *United States v. Baylin,* 696 F.2d 1030, 1042–43 (3d Cir.1982) (maintaining the authority to reassign cases to "preserve the appearance of justice"); *Santiago v. Garcia,* 821 F.2d 822, 832 (1st Cir. 1987) (adopting the *Robin* test of the Second Circuit); *Everett Plywood Corp. v. United States,* 227 Cl.Ct. 415, 651 F.2d 723, 734 (1981) (considering charges of judicial bias and prejudice).

Without doubt, New England's requested remedy of a new trial and/or advising reassignment to a different judge are within appellate authority under 28 U.S.C. § 2106. The grant of such remedy, when warranted by the circumstances, is not a matter of intrusion into the supervision or internal management of district courts; it is simply a matter of doing the judicial job of justly resolving disputes between parties. For if the issue of judicial bias can not be reviewed on appeal to the Federal Circuit, jurisdiction must lie elsewhere—a possibility eliminated by the *Hohri* and *Christianson* decisions. New England is entitled to full appellate review. *See Deslions v. La Bourgogne,* 210 U.S. 95, 111, 28 S.Ct. 664, 669, 52 L.Ed. 973 (1908) ("all the questions presented by the record are open and, as far as they are essential, must be disposed of"); *Aerojet–General Corp. v. Machine Tool Works,* 895 F.2d 736 at 739 n. 5 (Fed. Cir.1990) (*in banc*) ("The statute, 28 U.S.C. 1295(a), mandates that we decide nonfrivolous issues of whether we have appellate subject matter jurisdiction over the appeal, however difficult those issues may prove to be.")

Because the issues of judicial bias and remand would have been reviewable by the regional circuit, there can be little doubt that they are equally reviewable by the Federal Circuit. I would have preferred that the court address this matter in its opinion so that it would be clear to the litigants whether it had been considered.[2]

---

**2.** The court took this case *in banc* in order to delete from the proposed panel opinion the discussion of the issue of judicial bias.