Lino L. ALPHONSO, Plaintiff,

v.

PITNEY BOWES, INC. and Norm Sommer, Defendants.

Civil Action No. 01–3352(JBS).

United States District Court, D. New Jersey.

March 7, 2005.

Kenneth A. Sandler, Esq., Marlton, NJ, and Richard E. Yaskin, Esq., Law Offices of Richard E. Yaskin, Voorhees, NJ, for Plaintiff.

Kathryn H. Levering, Esq. (pro hac vice), David J. Woolf, Esq., Drinker Biddle

& Reath LLP, Philadelphia, PA, for Defendants.

## AMENDED OPINION

SIMANDLE, District Judge.

This matter comes before the Court on Defendants' motion for sanctions, attorneys' fees and costs against Plaintiff's counsel, pursuant to 28 U.S.C. § 1927.[1] The principal issue to be decided is whether Defendants have demonstrated that Plaintiff's counsel vexatiously multiplied the proceedings by persisting in prosecuting claims for monetary damages that were not factually supportable. This Opinion delineates, based on a discussion of specific details with respect to three separate issues arising in this litigation, when advocacy of non-meritorious damage claims becomes vexatious and thus sanctionable under § 1927, and when it does not. Based on the reasons discussed herein, Defendants' motion will be granted in part and denied in part.

## I. INTRODUCTION AND FACTUAL BACKGROUND

The facts of this case are well-known to the parties. The facts pertinent to the motion now before the Court are given here.

Plaintiff Lino Alphonso was a sales representative who worked in Pitney Bowes' office in Delran, New Jersey, from January 1997 until June 9, 1999, when he was terminated. He alleged that his termination constituted unlawful retaliation under the New Jersey Law Against Discrimination ("NJLAD" or "LAD"), N.J.S.A. 10:5-1, et seq. He further alleged he had engaged in protected activity by repeating to management some unkind remarks he allegedly had heard co-workers say about an African–American manager who had recently been promoted. After Defendant Norm Sommer terminated him for making inappropriate remarks and unfounded accusations, Plaintiff was unemployed for two months and started a new job (actually, a series of new jobs through 2002) at *higher* pay.

Plaintiff's complaint was filed in the Superior Court of New Jersey, Burlington County, on June 8, 2001, and it was properly removed to this court by Defendants based on diversity of citizenship, 28 U.S.C. § 1332, on July 16, 2001, where it was assigned to the Honorable Stanley S. Brotman. The case was reassigned to the undersigned on October 2, 2003, and the jury trial commenced on December 8, 2003.

On December 22, 2003, after nine days of trial and a short deliberation, the jury returned a defense verdict in favor of Pitney Bowes and against Lino Alphonso, no cause for action. The jury unanimously found that Mr. Alphonso had not engaged in "protected conduct" and, therefore, had no basis for his retaliation claim against Pitney Bowes. While Pitney Bowes, as the prevailing party, could pursue a petition for fees against Plaintiff under the NJLAD, it has chosen to forego that option and instead moves, under 28 U.S.C. § 1927, against Plaintiff's counsel based upon certain conduct in which they engaged during the prosecution and trial of this case that Defendants allege was so unreasonable and vexatious as to constitute bad faith and warrant sanctions.[2]

---

1. The earlier version of this Opinion was originally filed on July 21, 2004. Upon Plaintiff's motion for reconsideration, the Court has provided selected amendments.

2. Defendants direct their motion principally to Kenneth Sandler, Esq., as Plaintiff's primary counsel. Richard Yaskin, Esq. joined Mr. Sandler as Plaintiff's co-counsel shortly before trial. Almost all actions of Plaintiff's counsel of which Defendants complain in this motion were those of Mr. Sandler.

The applicable statute, 28 U.S.C. § 1927, provides, "An attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." The statute is designed to hold counsel accountable where they intentionally and unnecessarily delay and multiply the proceedings. *See Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 899 F.2d 1171 (Fed.Cir.1990).

Defendants argue that this is exactly what happened in this case. First, Defendants assert that Plaintiff's counsel refused to drop Plaintiff's claim for post-1999 economic damages when the claim was clearly frivolous. Second, Defendants argue that Plaintiff's counsel refused to drop Plaintiff's claim for post-1999 emotional distress damages until after they had elicited from Plaintiff the testimony at trial about continual distress that they wanted the jury to hear and then limited the claim to 1999 to prevent Defendants from countering that testimony with evidence that seriously undermined the credibility of Plaintiff's testimony. Third, Defendants contend that Plaintiff's counsel made incessant and unprincipled arguments to preclude the taking, and Defendants' use, of the *de bene esse* deposition of Edward Logan. Each of these actions, Defendants state, caused Pitney Bowes to incur unnecessary expense, and are sanctionable under Section 1927.

As early as September 13, 2001, Pitney Bowes, through its counsel, warned Mr. Sandler that it would seek to hold him accountable if his objectionable conduct continued. By that date, Mr. Sandler had unreasonably prolonged discussions over the preparation of a Joint Discovery Plan, forced Pitney Bowes to seek the intervention of the magistrate judge in order to effectuate the routine service of subpoenas on Plaintiff's post-Pitney Bowes employers and refused to directly provide to Pitney Bowes the authorizations to obtain medical records that then-Magistrate Judge Kugler told him he must provide.[3] Pitney Bowes' counsel wrote Mr. Sandler and warned:

> I do not want this litigation to be fraught with continual and unnecessary battles over matters concerning which there should be no legitimate disagreement. The result will only be inflated litigation costs for which we think your client will ultimately bear the financial burden. But, in the short term, if we have to unnecessarily involve the Court in resolving commonplace issues, we will need to seriously entertain the prospect of sanctions. I state this not as a threat, but as a fact, and with the hope that the sounding of this cautionary note will facilitate the reasonable conduct of this case as we proceed.

(Def. Ex. A, 9/13/01 Levering to Sandler Letter at p. 2).

---

3. Pitney Bowes explicitly asked Mr. Sandler to have his client execute the provided release of medical records authorization forms and return the same directly to counsel. (*See* August 22, 2001 Woolf to Sandler Letter.) The record reflects, however, that this was not done and, instead, Mr. Sandler mailed the releases directly to Plaintiff's physicians, attempting to obtain the records himself. Upon motion for reconsideration, Mr. Sandler argues that his actions were the result of his genuine concern as to confidentiality. Such a concern, however, was unfounded, given the assurances provided by Defendants' counsel in this regard. (Id.) ("It is our expectation that your need for a confidentiality agreement will not slow Mr. Alphonso's execution of the medical records authorizations. As we told you at the conference, you have our word that we will not disclose any documents that we receive from the subpoenaed physicians to anyone other than counsel for Pitney Bowes until such time as we reach consensus on a confidentiality agreement.")

█ Plaintiff's counsel oppose this motion, arguing generally that the positions they advocated were not taken in bad faith and that, if the claims were as lacking in substance as Defendants now claim, defense counsel expended too much time and money in efforts to defend them, as discussed further below.[4]

## A. Attorney Conduct Concerning Plaintiff's Claim for Lost Earnings

Defendants assert that Plaintiff's counsel refused to genuinely assess Plaintiff's claim for lost earnings by either learning or appropriately acknowledging that Plaintiff's earnings from other employers exceeded what he would have earned from Pitney Bowes. Plaintiff was required to provide a damages calculation with his initial disclosures. *See* Fed.R.Civ.P. 26(a)(1)(C). Mr. Sandler did not, and Pitney Bowes pressed for this information. (Def. Ex. B, 8/20/01 Woolf to Sandler Letter).

On September 27, 2001, Pitney Bowes' counsel provided to Mr. Sandler the documents it obtained from SCI, Plaintiff's first post-Pitney Bowes employer. The documents showed that Plaintiff was unemployed for only two months, that he had earned more money at SCI than he earned at Pitney Bowes, that his SCI salary was higher than his Pitney Bowes salary, and that Plaintiff had abandoned his job at SCI, his first after Pitney Bowes, thereby disqualifying himself from future loss. *See Weiss v. Parker Hannifan Corp.*, 747 F.Supp. 1118, 1132 (D.N.J.1990). More than two years before trial, Pitney Bowes' counsel asked Mr. Sandler to limit Plaintiff's claim for lost earnings. (Def. Ex. C, 9/27/01 Levering to Sandler Letter). Mr. Sandler refused and chose instead to press ahead with Plaintiff's unrestricted claim for continued future lost earnings.[5]

On April 26, 2002, Pitney Bowes' counsel confirmed in writing that it would seek

---

**4.** Plaintiff's counsel have also argued that Defendants made a settlement offer on the eve of trial (which Plaintiff rejected) and that the offer undermines Defendants' assertions that Plaintiff's damage claims were frivolous and vexatious. Plaintiff's counsel's mention of confidential settlement discussions for the purpose of now contradicting Defendants' arguments violates Rule 408 of the Federal Rules of Evidence, which states:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness,

negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

It is improper to argue that Pitney Bowes' settlement offer demonstrates either the possible validity or the value of Plaintiff's claim. The effort to reach a compromise settlement of this NJLAD claim, in which liability was sharply disputed, is more likely seen as a business decision to achieve finality and to avoid the cost and uncertainty of trial and the prospect of an award of substantial attorneys' fees to Plaintiff if he prevailed even with only slight damages for economic or emotional harm. In any event, Plaintiff's argument on this point must be disregarded.

**5.** The undisputed facts showed that Mr. Alphonso's income rose in 2000 and 2001 after his termination from employment in June, 1999. His 1998 earnings were $36,584, and he earned $17,656 through June 9, 1999. (Joint Final Pre–Trial Order, filed March 12, 2003 at Stipulation ¶¶ 9 & 10). He earned $11,735 in 1999 in his subsequent employment with SCI, increasing to $41,767 in 2000 and $49,259 in 2001 with several employers. (*Id.* at ¶¶ 21, 25, 28).

sanctions under Section 1927 against Mr. Sandler at the conclusion of this case:

I've told you before, and I will say it again with even more conviction: when this case ends, we will seek sanctions against you to the fullest extent available. Your conduct in this case has been obstreperous, and now duplicitous. There will be a judgment day.

\* \* \*

Rarely in my 25 years of practice have I written so stern a letter. But your conduct today, and throughout the case, clearly warrants it. I strongly suggest you invest the time to look into 28 U.S.C. § 1927 and other statutes and rules authorizing sanctions.

(Def. Ex. D, 4/26/02 Levering to Sandler Letter).[6] Mr. Sandler persisted and retained an expert in an attempt to support Plaintiff's exaggerated economic damage claim. The expert, Dennis Meyerson, an accountant who had failed his CPA exam (Def. Ex. E, Transcript of April 30, 2002 Deposition of Dennis Meyerson at 71), produced a report augmenting Plaintiff's damages, claiming that Plaintiff would have been promoted had he remained at Pitney Bowes.[7] The post-termination wage loss was calculated at $535,079 based on the assumption that Plaintiff (who earned $36,584 in his last full year of employment in 1998)[8] would have become a manager in 2005 at an expected salary of $86,550.[9]

Pitney Bowes deposed Mr. Meyerson, who knew nothing about Pitney Bowes' criteria for promotion (id. at 87–88), was not aware of any promotion opportunities for which he assumed Plaintiff qualified (id. at 87) and had no information about how or what Pitney Bowes pays its managers (id. at 149). He admitted that he just assumed that Plaintiff would have been promoted in 2005 because Plaintiff told him so. (Id. at 86–88). He also stated that the post-promotion salary he projected of $86,550 was purely hypothetical and not based on Pitney Bowes actual compensation system. (Id. at 148–49). Mr. Meyerson subsequently agreed that, absent a promotion, Plaintiff suffered no lost earnings through at least 2004—five years after Plaintiff's termination. (Id. at 146–47). *Plaintiff's counsel had thus knowingly propounded a claim of over one-half of a million dollars in wage loss based on nothing.*

On May 3, 2002, Defendants' counsel summarized Mr. Meyerson's deposition testimony in a letter to Mr. Sandler. Ms. Levering correctly wrote, *inter alia,* "It now appears clear that, even under the best of circumstances, Mr. Alphonso only

---

6. Defendants assert that the triggering event for this letter was Mr. Sandler's insistence that Defendants would engage in improper *ex parte* communication were they to submit a confidential statement of settlement position to the Court in advance of a settlement conference Magistrate Judge Kugler had scheduled.

7. The Court notes that Mr. Meyerson's report also contained a second scenario, which produced a far lower loss figure. Because the Court's concern with regard to sanctions is only with counsel's actions surrounding the inflated "assumed promotion" scenario, it confines the remainder of its discussion to that very projection.

8. See Joint Final Pre–Trial Order, *supra,* Stipulated Facts ¶ 9.

9. Given Plaintiff's employment history and the records documenting the same, as known to Mr. Sandler at least by September 27, 2001, it is inconceivable to this Court that counsel could, in good faith, have served an expert report with a damages calculation premised on the incredulous prediction that Plaintiff would have received a promotion more than doubling his pay and therefore suffered such staggering future economic loss. (*See* September 27, 2001 Levering to Sandler Letter.)

can lay claim to, at best, a $9,388 loss." (Def. Ex. F, 5/3/02 Levering to Sandler Letter). Despite the fact that Mr. Meyerson's deposition testimony undermined the conclusions in his report, Mr. Sandler did not withdraw Mr. Meyerson as a witness or limit Plaintiff's economic damages claim. Indeed, Mr. Sandler ignored Pitney Bowes' counsel's efforts to avoid unnecessary costs and instead pressed on.

As a result, costs escalated. Faced with Plaintiff's counsel's insistence on calling Mr. Meyerson as an expert, Pitney Bowes engaged a forensic economist, Jerome Staller, Ph.D., and incurred the expense of providing a report that stated that Plaintiff had a minimal loss in his year of termination (1999) and no viable claim to any economic loss after 1999. Long after Defendants produced this export report, Plaintiff's counsel attempted to add still another expert to further buttress their claim.

On March 10, 2003, the day before the Final Pretrial Conference, and over a year after the close of discovery, Mr. Sandler added Andrew Verzilli, Ph.D., to Plaintiff's witness list on the working draft of the Final Pretrial Order to testify in "rebuttal" to Dr. Staller. This caused Pitney Bowes to incur additional expense. Dr. Verzilli was never timely identified as an expert; Rule 26(a) disclosures were never made; and no rebuttal report was ever prepared, timely or otherwise. Yet, oddly enough (given the clear mandates of Rule 16(a) and 26(a)(2), as well as the Scheduling Orders, regarding timely disclosure of expert's identities and reports), Mr. Sandler insisted that Dr. Verzilli could testify at trial. Pitney Bowes was forced to file a motion *in limine* to preclude his testimony, which Magistrate Judge Donio granted. (Def. Ex. G, 11/14/03 Order at p. 2).

Plaintiff's counsel pursued Plaintiff's claim for economic damages, without diminution of Mr. Meyerson's baseless opinion regarding future wage loss, into trial. Only after Pitney Bowes incurred the expense of preparing to defend against Plaintiff's lost earnings claim did Plaintiff's counsel drop the claim for any lost earnings after 1999 and tell Defendants' counsel, on the very last day of Plaintiff's presentation of his case in chief before a jury, that they were not calling Mr. Meyerson to testify.

### B. Conduct Concerning Plaintiff's Emotional Distress Damages Claim

Defendants contend that Plaintiff's counsel pursued a hopelessly compromised claim for unrestricted emotional distress damages. First, Defendants accuse Plaintiff's counsel, Mr. Sandler, with knowingly concealing the truth about Plaintiff's lack of consultation with mental health professionals. Defendants sought executed medical authorizations so that counsel could obtain Plaintiff's medical records and investigate for themselves Plaintiff's claim of emotional distress. Although Mr. Sandler insisted that he obtain the records and provide Defendants' counsel copies, Defendants' counsel did not want Mr. Sandler to filter what Defendants could see. Defendants were forced to raise the issue with then-Magistrate Judge Kugler, who instructed Mr. Sandler to provide defense counsel with authorizations, as is proper and customary. Mr. Sandler, however, sent the authorizations to the medical providers and directed them to furnish him, not Defendants' counsel, with those records. Only after defense counsel involved Judge Kugler again did Mr. Sandler provide the necessary authorizations.

In response to Pitney Bowes' interrogatories, Mr. Sandler had written that Plaintiff had seen at least two physicians, as well as his sister-in-law, for psychological treatment after his termination. (*See* Def. Ex. H at p. 8, # 11). Plaintiff's counsel

also had represented that Plaintiff had newfound problems with sleeplessness and headaches caused by his termination. (Def. Ex. I, Plaintiff's Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment at pp. 9–10, ¶ 22). The medical records, however, when finally disclosed to Defendants' counsel, actually reveal that Plaintiff had headaches dating back to 1993, and that he had never sought any medical attention for sleeplessness.

On January 14, 2002, Defendants conducted the deposition of Plaintiff's wife, Angelina Guieb–Alphonso. Defendants contend that Mr. Sandler said that, despite what the medical records established, Plaintiff's wife would substantiate Plaintiff's claim that he had serious headaches and sleeplessness caused by his termination. Ms. Guieb–Alphonso's testimony was just the opposite. She confirmed that Plaintiff had headaches and sleeplessness before he separated from Pitney Bowes and that his headaches were not "as bad" after his termination, and that his sleep pattern was no different. Her deposition transcript reflects:

Q: And after he left the employ of Pitney Bowes in June 1999, did [Plaintiff's] headaches continue?

A: They continued—it's not as bad as previous headaches.

Q: So they continued but they weren't as bad as they had been when he was actually working at Pitney Bowes; is that right?

A: Right. Right.

* * *

Q: ... Now, after his termination of employment from Pitney Bowes, was there any change in his getting up in the middle of the night and his sleep pattern?

A: No.

(See Def. Ex. J, Guieb–Alphonso Tr. at 36, 60). Defendants further argue that Mr. Sandler attempted to change Ms. GuiebAlphonso's testimony through an errata sheet he wrote. The testimony "it's not as bad as previous", changed to "it's worse than previous" and "right, right" changed to "no." (Def. Ex. K, Guieb–Alphonso Errata Sheet). Although listed among Plaintiff's witnesses, Ms. Guieb–Alphonso was not called to testify at her husband's trial.

Plaintiff's counsel sought to buttress this claim by engaging an expert and forcing Defendant to do the same. Plaintiff's expert was Andrew F. Jensen, Ph.D. Plaintiff's counsel failed to provide Dr. Jensen any medical records; failed to tell Dr. Jensen of Plaintiff's wife's testimony; failed to provide Dr. Jensen with the medical records showing that Plaintiff did not complain of any stress or anxiety posttermination; failed to provide him Plaintiff's self-assessment in September 2001, just three months after Plaintiff's counsel filed the Complaint claiming continual emotional distress, that he had no psychological or sleep problems; and failed to provide Dr. Jensen with Plaintiff's post-Pitney Bowes employment records that showed that Plaintiff had other stressors that could have caused Plaintiff's supposed distress.

Plaintiff's problems at his post-Pitney Bowes employers were serious: Plaintiff was counseled, among other things, for lying to his supervisor about whether he actually had made appointments with clients, for leaving "nasty" voicemail messages for his supervisor, for telling a customer to "pretend" she was someone else so that she could sign a contract, and for lying to customers. (See Def. Ex. EE, RCN and SCI warnings).

To respond, Pitney Bowes engaged Robert M. Toborowsky, M.D., as its forensic psychiatrist. Dr. Toborowsky reviewed all

of Plaintiff's medical and employment records and the deposition transcripts. On April 2, 2002, Dr. Toborowsky examined Plaintiff, with Mr. Sandler present. Plaintiff stated plainly that he was not suffering any present distress and that he was "hail and hardy just like everybody else." (*See* Def. Ex. L, Toborowsky Report at 3, 4, 6).

When Defendants sought to limit Plaintiff's use of Dr. Jensen and his report at trial, Plaintiff's counsel fought to present the testimony and to preclude Defendants from presenting evidence of other stressors in Plaintiff's life after his termination from Pitney Bowes that could explain the emotional distress Plaintiff claimed he was suffering up through the present. Defendants were allowed to use evidence of Plaintiff's potential stress from his subsequent employers. At trial, Plaintiff testified about continuing distress from the day he was terminated up through the present and broke down in tears during his testimony. Immediately prior to a cross-examination that in all likelihood would have been factually devastating to any post–1999 claim, Plaintiff's counsel limited the emotional distress claim to 1999. Defendants contend that as soon as the cross-examination began concerning the problems Plaintiffs had at subsequent employers and the probable stress Plaintiff felt as a result, Plaintiff's counsel withdrew the claim for any distress damages after 1999. At the time of cross-examination, Mr. Yaskin simply stated, "I would like to cut short this course of action and make a formal withdrawal of Plaintiff's emotional distress damages claim." (*See* Def. Ex. X, 12/15/03 Trial Tr. at 345).

Defendants contend that by dropping the claim for post–1999 emotional distress damages so late in the proceedings, literally *after* Plaintiff testified on that issue, Plaintiff's counsel forced Pitney Bowes to incur the unnecessary expense of deposing Plaintiff's expert, arguing over the scope of his intended testimony, engaging an expert of its own, preparing for the cross-examination of Plaintiff with regard to this claim, and preparing for the presentation of Pitney Bowes' forensic psychiatrist at trial. Defendants do not quarrel with the dropping of the claim, but with the two-year delay in doing so after it became apparent that Mr. Alphonso had no provable claim for emotional distress. Defendants argue that all of these were unnecessary expenses, vexatiously caused, for which Plaintiff's counsel should bear the costs.

### C. Conduct Concerning The Trial Deposition of Edward Logan

Defendants assert that Plaintiff's counsel's conduct in contesting the taking of Edward Logan's *de bene esse* deposition and its use at trial warrants sanctions. Mr. Sandler knew since at least March 11, 2003 that Defendants intended to schedule a trial deposition for medical reasons and identified Mr. Logan in particular by April 24, 2003, when it asked Plaintiff's counsel about mutually convenient dates for the deposition. (*See* Def. Ex. O, 7/30/03 Sandler letter to U.S.M.J. Donio). Mr. Sandler, however, waited until July 30, 2003, eight days before the long-scheduled deposition, to raise the issue with the Court. Magistrate Judge Donio ordered the deposition to proceed and brokered with the parties the terms of a declaration that would satisfy Mr. Sandler's concerns about Mr. Logan's unavailability.

Defendants provided the agreed-upon declaration. (*See* Def. Ex. Z, 8/4/03 Woolf to Sandler letter). Plaintiff's counsel claimed it was not good enough and Judge Donio ordered that the deposition proceed. Plaintiff's counsel questioned Mr. Logan over 68 pages of transcript. Pitney Bowes offered Mr. Sandler the chance to conduct discovery of Mr. Logan's physician(s).

(*See* Def. Ex. Y, 8/6/03. Woolf to Sandler letter). Mr. Sandler declined the offer, while insisting that Mr. Logan was not "unavailable." Defendants contend that this conduct, and other acts like it, resulted in the waste of dozens of hours of attorney time and cost Pitney Bowes thousands of dollars in fees and costs.

## II. *DISCUSSION*

### A. *Legal Standard for the Imposition of Sanctions*

■ Title 28 of the United States Code, Section 1927 permits a court to impose sanctions upon counsel for engaging in conduct that "multiplies the proceedings in any case unreasonably and vexatiously" and require that counsel personally satisfy "the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *See* 28 U.S.C. § 1927. Willful bad faith is required. *Williams v. Giant Eagle Markets,* 883 F.2d 1184, 1190–91 (3d Cir.1989); *Ford v. Temple Hosp.,* 790 F.2d 342, 347 (3d Cir.1986). The "intentional advancement of a baseless contention that is made for an ulterior purposes, *e.g.,* harassment or delay," is indicative of bad faith. *Ford,* 790 F.2d at 347. "[B]ad faith may [also] be inferred 'when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose....' " *D'Auria v. Minniti (In re Minniti),* 242 B.R. 843, 850 (Bankr.E.D.Pa.2000)(quoting *Estate of Perlbinder v. Dubrowsky (In re Dubrowsky),* 206 B.R. 30, 36 (Bankr.E.D.N.Y. 1997)); *see also Veneziano v. Long Island Pipe Fabrication & Supply Corp.,* 238 F.Supp.2d 683, 692 (D.N.J.2002).

■ Sanctions under Section 1927 do not depend upon a finding that the lawsuit itself was filed in bad faith. Instead, sanctions attach under Section 1927 when an attorney continues the suit, or some aspect of it, after the attorney learns that it lacks merit. *See Murphy v. Housing Authority & Urban Redevelopment Agency,* 158 F.Supp.2d 438, 450 (D.N.J.2001)(continued pursuit of claim where there was a "dearth of any evidence ... supporting [p]laintiff's claims" warrant sanctions under Section 1927); *Matthews v. Freedman,* 128 F.R.D. 194, 207 (E.D.Pa.1989)(continuing after learning the claims were barred by the statute of limitations), *aff'd without op.,* 919 F.2d 135 (3d Cir.1990); *Fred A. Smith Lumber Co. v. Edidin,* 845 F.2d 750 (7th Cir.1988); *Ford,* 790 F.2d at 350.

■ The determination as to whether there has been "bad faith" is made by the court. *Boykin v. Bloomsburg Univ.,* 905 F.Supp. 1335, 1347 (M.D.Pa.1995). Even if the court finds such bad faith, the court retains discretion as to the imposition of attorneys' fees as a sanction. *Ford v. Temple Hospital,* 790 F.2d 342, 347 (3d Cir.1986), cited in *Jones v. Pittsburgh National Corp.,* 899 F.2d 1350, 1358 (3d Cir. 1990). "[O]nce a finding of bad faith has been made, the appropriateness of sanctions is a matter entrusted to the discretion of the district court." *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 505 (3d Cir.1991)(citing *Hackman v. Valley Fair,* 932 F.2d 239, 242 (3d Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991)). A number of courts have cautioned, however, that the power to impose sanctions "should be exercised with restraint, lest the prospect chill the ardor of proper and forceful advocacy on behalf of [the] client." *Williams v. Giant Eagle Markets,* 883 F.2d 1184, 1194 (3d Cir.1989)(quoting *Colucci v. New York Times Co.,* 533 F.Supp. 1011, 1014 (S.D.N.Y.1982)).

### B. *Plaintiff's Claim for Economic Damages*

Defendants seek a monetary sanction under Section 1927 with respect to part of

defense counsel's efforts necessitated by Plaintiff's assertion of elaborate economic losses exceeding $500,000 following his termination from employment when in fact his only possible losses arose from two months unemployment (calculated as $9,388, see Def. Ex. F) and a 10 percent fee of $1,200 for early withdrawal of his 401(k) plan, for a total possible economic loss of $10,588. On this economic damages issue, Defendants seek recovery of $8,895 for Mr. Woolf's services (Woolf Aff. ¶ 11) and $301.50 for Ms. Levering's services (Levering Aff. ¶ 8) and reimbursement for retaining Dr. Jerome Staller as a rebuttal economic damages expert in the amount of $6,942.00, for a total of $16,138.50. This Court agrees in full.

Defendants argue that Plaintiff's counsel refused to limit Plaintiff's claim for economic damages consistent with the undisputed facts; instead, Plaintiff's counsel asserted an artificially inflated future lost wage claim exceeding $500,000 up through the close of its case in chief, when that claim was finally abandoned.

Plaintiff's own expert, Dennis Meyerson, testified at his deposition on April 30, 2002 that, following his initial two month period of unemployment, Plaintiff actually made more money than he would have earned had he remained at Pitney Bowes. After the Meyerson deposition, Ms. Levering asked Mr. Sandler to limit the damage claim. (See Def. Ex. F). Mr. Sandler refused, however, and the claim continued until the middle of trial.

Plaintiff's counsel also pressed other claims for damages—the 401(k) loss, additional driving expenses to his new, higher-paying job, and the lost promotion—which they argue justify their decision to not withdraw Plaintiff's claim for post–1999 economic losses. Plaintiff's claim for 401(k) loss, although raised at trial, may not have been legally viable because it constituted a double counting of benefits and failed to consider both the stock market's swoon in 1999, 2000 and 2001 and the myriad of mitigation opportunities available to Plaintiff as his total familial income increased in subsequent years. At best, the claim was one for the $1,200 tax penalty imposed on Plaintiff for his early withdrawal of his 401(k) monies. This was the only amount Plaintiff ultimately pursued to verdict concerning the 401(k) claim. This amount, however, arose in 1999 and does not justify a post–1999 economic loss claim.

Furthermore, Plaintiff's claim for additional driving expenses was also inflated. These modest amounts were more than offset by the additional income Plaintiff received from his post-Pitney Bowes employers. This Court explained that at trial and, at that late point, Plaintiff's counsel dropped this claim.

Defendants further contend that Plaintiff's assertion that he would have been promoted was manufactured; Mr. Sandler further advocated Mr. Meyerson's projected damages based on an assumed promotion more than doubling Mr. Alphonso's salary that had no basis in fact. Mr. Meyerson testified that he had no knowledge of the criteria Pitney Bowes employed to promote its sales people or what opportunities for promotion were available; that he had no reason to believe that Plaintiff would have been promoted other than Plaintiff's bald statement that a promotion would be forthcoming in 2005; and that he had no knowledge of what a typical Pitney Bowes sales manager earns. He simply posited a hypothetical post-promotion salary at $86,550, admitting that "it could be lower or it could be higher." Such baseless testimony hardly fulfills the expert's essential function of offering opinions based upon reliable information which will be of assistance to the jury.

Plaintiff's counsel refused to acknowledge that such efforts to recover post–1999

economic damages were frivolous. *See Williams v. Rene*, 72 F.3d 1096, 1101–03 (3d Cir.1995)(expert's economic damages testimony rejected where underlying assumption "unsupported and speculative"); *Benjamin v. Peter's Farm Condominium Owners Ass'n.*, 820 F.2d 640, 642–43 (3d Cir.1987)("[The Third Circuit] has required more than speculative opinion when determining damages for prospective earnings loss.... Although mathematical exactness is not required, testimony of post-injury earning capacity must be based upon the proper factual foundation."); *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir.1983)(rejecting economic damages expert's testimony where no evidence was presented to support claim that the plaintiff would experience a dramatic income increase). The result was to force Pitney Bowes to incur the expense of defending against a frivolous promotion possibility and of engaging an economist to testify to what should have been stipulated long before—the limited amount of Plaintiff's claimed earning loss.

██ Case law is clear that where an attorney, for an improper purpose, disregards applicable law and pushes a claim in the absence of supporting facts, bad faith is evident and sanctions are appropriate under 28 U.S.C. § 1927. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Actions*, 278 F.3d 175, 188 (3d Cir.2002)("[i]ndications of this bad faith are findings that the claims advanced were meritless, that counsel knew or should have known this, and that the motive ... was for an improper purpose")(internal quotations and citations omitted); *Murphy*, 158 F.Supp.2d at 450 (counsel's "disregard for the undisputed facts of this case and the applicable law" warrant sanctions under Section 1927); *Rodriguez v. Banco Cent.*, 155 F.R.D. 403, 407 (D.P.R. 1994)("there is a point beyond which zeal becomes vexation, the 'novel' approach to a legal issue converts to frivolity and stead-fast adherence to a position transforms to obdurateness") (citations omitted).

██ The Court does not expect clairvoyance from counsel, and the initiation of this claim is not why a sanction is considered herein. While Mr. Sandler may not have initiated his client's half-million dollar economic damages claim in bad faith, his relentless pursuit of that claim after the evidence demonstrated, at most, a comparatively trivial amount of loss shows bad faith by Mr. Sandler. Here, Plaintiff's claim for economic damages beyond 1999 had no chance of success. The hard "damages," as Plaintiff's counsel was told by Defendants' counsel and judges alike, were no greater than approximately $10,600 on Plaintiff's best day. Plaintiff's counsel chose to "turn[ ] a blind eye to the facts and law and ... unreasonably and vexatiously multiplied the proceedings of the case." *Murphy*, 158 F.Supp.2d at 451. Plaintiff's counsel manufactured a promotion claim when no such claim existed; and they added an unauthorized expert the day before the Final Pretrial Conference, who was ultimately barred by Magistrate Judge Donio.

Defendants further contend that the timing of Plaintiff's counsel's mid-trial decision to drop Plaintiff's claim for economic loss after 1999 suggests bad faith. Although Mr. Sandler long knew of the facts relevant to the claim and had been told that they did not support his demand, Plaintiff's counsel waited until mid-trial to drop the claim. Even though Mr. Sandler now says he had decided before trial that he did not plan on pursuing this claim at trial (*see* Sandler Cert. at ¶ 31 (omitting promotion claim from list of "elements of economic damages" Mr. Sandler believed Plaintiff could pursue "following the issuance of Mr. Meyerson's report and deposition")), he did not drop the post–1999 wage loss claim until mid-trial. Such action un-

reasonably forced Defendants to respond to the inflated damages claim by retaining an expert and preparing for the experts' and other witnesses' testimony. Plaintiff's counsel also refused to tell Defendants' counsel that they were not calling Mr. Meyerson as a witness until the last day of Plaintiff's case in chief, causing Defendants unnecessarily to incur the expense of preparing to cross-examine Mr. Meyerson and to present their rebuttal expert and foundation witnesses to testify in the defense case.

Pitney Bowes seeks reimbursement only for costs and fees incurred after March 1, 2002. It was then that Pitney Bowes received Mr. Meyerson's report with Plaintiff's counsel's unsupportable claim for post–1999 economic damages and after which Pitney Bowes incurred most of the related attorneys' fees and costs. These costs and fees equal $16,138.50. (*See* Levering Aff. at ¶ 8 (as to counsel fees of $301.50)); Woolf Aff. at ¶¶ 11, 13 (as to counsel and expert fees of $15,837.00). Defendants' counsel repeatedly reached out to Mr. Sandler, urging him to reconsider this claim and warning him of the possibility of sanctions. Mr. Sandler, however, willfully turned a blind eye on numerous occasions. The record reflects that all of the facts that formed the basis for the decision to drop this claim at trial were known to Plaintiff's counsel long before the trial date neared. In light of this, this Court finds the imposition of sanctions in the amount of $16,138.50 to be appropriate.

## C. *Plaintiff's Emotional Distress Damages Claim*

██ Defendants seek reimbursement of $16,853.00 for counsel and expert witness fees necessitated by Plaintiff's unsupported claim of emotional distress. This Court agrees in part.

Defendants argue that Plaintiff's counsel knew that Plaintiff's claim for post–1999 emotional distress damages was unsupported by the evidence. The Court finds that Plaintiff's counsel knew, or should have known, upon receiving Plaintiff's medical records, that he had never seen a psychiatrist or other mental health care provider for claimed distress. (*See generally* Def. Ex. CC, Plaintiff's Medical Records from Meetinghouse Family Physicians; Def. Ex. DD, Plaintiff's Medical Records from Neurological Regional Associates). Counsel also knew, or at least should have known based on a review of the medical records, that Plaintiff had stated on September 22, 2001, a few months after this lawsuit was filed, that Plaintiff had told his own physician that he had no psychological or sleep problems. (Def. Ex. CC, Meetinghouse Records, at 2, line 26). Mr. Sandler also knew that Plaintiff had not kept a pre-scheduled doctor's appointment during the week following his termination from Pitney Bowes (Def. Ex. DD, Neurological Regional Associates Records, at 6, 14) and that Plaintiff had suffered from headaches and sought treatment for "chronic anxiety" for years before his separation from Pitney Bowes. (Def. Ex. CC, Meetinghouse Records at 27 (headaches and chronic anxiety as of July 27, 1993) and 14, 15, 58, 60 (headaches in June 1997); Def. Ex. DD, Neurological Regional Associates Records at 3, 7, 9 (headaches as of June 1997)).

Plaintiff's wife testified that Plaintiff, whom she labeled a "discipline freak" even before he left Pitney Bowes, was emotionally stable and did not need care from a mental health professional after leaving Pitney Bowes. (*See* Def. Ex. J, Guieb–Alphonso Tr. at 30–33, 36, 40, 55–57, 60, 63–64, 68–70). In addition, she testified that Plaintiff's headaches were better after Pitney Bowes, that his sleep pattern did not change, and that, by the time Plaintiff began working for his first post-Pitney Bowes employer, SCI, there was "nothing

wrong with his emotions." (*Id.* at 36, 39–40, 60).

Mr. Sandler was also present when Defendants' emotional distress expert, Robert Toborowsky, M.D., evaluated Plaintiff on April 2, 2002. During his evaluation, with Mr. Sandler present, Mr. Alphonso told Dr. Toborowsky that he was not suffering any present distress and that he was "hail and hardy just like everybody else." (*See* Def. Ex. L, Toborowsky Report at 3, 4, 6). Mr. Sandler, however, states that he did not take this statement to undermine Mr. Alphonso's emotional distress claim. (Sandler Cert. at ¶ 23). It is not understandable to this Court that Mr. Sandler could know that his client felt fit, sought no professional help, and had no proof of any worsening of his mental status due to his termination from employment at Pitney Bowes, and could still pretend that he did.

Plaintiff's counsel is also accused of acting consistently in a manner evidencing bad faith. Mr. Sandler refused to provide customary medical record authorizations to Defendants' counsel, necessitating Defendants' raising of the issue with former Magistrate Judge Kugler twice, in order to ascertain that Mr. Alphonso sought no post-termination treatment for any emotional difficulties. In addition, Mr. Sandler wrote, in response to Pitney Bowes' Interrogatory No. 11, that Plaintiff had received treatment for emotional distress from at least two "and possibly other physicians," as well as his sister-in-law, something he knew was false. (Def. Ex. H, Plaintiff's Answers to Interrogatories).[10] Furthermore, Mr. Sandler changed the testimony of Ms. Guieb–Alphonso and did not provide the explanation that Rule 32(e)

of the Federal Rules of Civil Procedure requires.

Mr. Sandler, however, states that Ms. Guieb–Alphonso's deposition answers appeared inconsistent and certifies that he believed Ms. Guieb–Alphonso to have been legitimately confused as to the deposition testimony which she gave via telephone, with Ms. Levering in Philadelphia and Ms. Guieb–Alphonso in California. (Sandler Cert. at ¶ 20). Notably, though, in opposition to Defendant's motion for sanctions, Plaintiff's counsel does not offer any affidavit of Ms. Guieb–Alphonso that speaks to this point. Furthermore, Mr. Alphonso identified Dr. Morena Cherkassky and Dr. Maria C. Mangione as medical providers with whom he consulted for the " 'loss of enjoyment of life, emotional distress damages' or any other harm or damage alleged in the Complaint" as requested by Interrogatory No. 11. Mr. Alphonso certified to the accuracy of these interrogatories on October 4, 2001. Interrogatory No. 11 specifically asked whether Mr. Alphonso "sought treatment … with … any medical provider." (Sandler Cert. ¶ 24).

Finally, Defendants argue bad faith on the part of Plaintiff's counsel in their allowing Mr. Alphonso to testify as to current distress and then to drop it abruptly at exactly the point where Defendants were about to confront Plaintiff with his post-Pitney Bowes stressors and the records of his pre-existing anxiety and headaches. The record reflects that Mr. Yaskin objected immediately when Ms. Levering began her cross-examination concerning confrontations and other stress at SCI, his first post-Pitney Bowes employer. (Def. Ex. C, 12/15/03 Trial Tr. at

---

10. *See also* Def. Ex. DD, Neurological Regional Associates Records at pp. 6, 14. Even assuming that Mr. Sandler was not yet aware of the full picture painted by Plaintiff's medical records at the time he initially provided his client's answers to opposing counsel, no supplemental or revised answers were ever submitted. It remained for defense counsel to determine that the phantom mental health consultations never occurred.

336–37). A sidebar ensued, during which this Court permitted Defendants to inquire into such stressors. (*Id.* at 336–45). At that point, Mr. Yaskin announced, "I would like to cut short this course of action and make a formal withdrawal of the plaintiff's emotional distress claim after the year 1999." (*Id.* at 345). Defendants contend that Plaintiff's counsel willfully waited to limit the claim until after the jury had heard from Plaintiff about his continuing emotional distress and then, by dropping the claim after 1999, silenced Defendants from contesting that testimony.

It cannot be fairly said that Mr. Alphonso's emotional distress claim was initiated in bad faith. Unlike the more objectively evaluated claim of economic damages (which had ceased to accrue more than 18 months before the date this case was filed in June, 2001), emotional distress damages, while still subject to a legal standard, are relatively subjective, requiring counsel to place significant weight on the plaintiff's own expressed belief that he suffered substantial emotional distress. However, the abject lack of evidence, at some point long before trial, should have given pause to Plaintiff's counsel (Mr. Sandler) and driven him to reconsider keeping this claim alive for trial. Based on the non-supportive medical records and deposition testimony before Plaintiff's counsel prior to trial, Plaintiff's post–1999 emotional distress claim was so shallow as to be non-existent.

Defendants argue that Plaintiff's counsel's behavior resulted in Pitney Bowes' incurring significant unnecessary fees and expenses in responding to the claim. Pitney Bowes therefore seeks sanctions in the amount of $16,853.00, the attorneys' fees

and expert costs that Pitney Bowes incurred after Mr. Sandler provided Defendants' counsel with their expert's, Dr. Jensen's, report. (*See* Levering Aff. at ¶ 10 (counsel fees of $7,289.00); Woolf Aff. at ¶¶ 15, 17 (counsel and expert fees of $9,563.00)). The time expended and fees incurred with respect to this claim bifurcate into two main categories: those associated with Plaintiff's medical expert, Dr. Jensen, and those associated with Defendant's expert, Dr. Toborowsky.

Based on the reasons set forth above, this Court finds that Plaintiff's counsel did not have a good faith basis for seeking post–1999 damages for emotional distress. The presentation of Plaintiff's emotional distress testimony to the jury before withdrawing it also evidences bad faith. The Court is hesitant, however, to impose the full amount of reimbursement sought for several reasons. First, by their nature, emotional distress claims by a client can be difficult for counsel to evaluate, and counsel should not be chilled from advocating for the recovery of such damages in an NJLAD case claiming wrongful termination due to retaliation; it is not unreasonable to assume that such termination would cause distress and that such distress should be asserted. Second, it would be apparent to anyone observing the trial, including the undersigned, that Mr. Alphonso is a troubled individual, prone to cry on the witness stand and to react inappropriately to the normal stresses of litigation. On the other hand, Mr. Alphonso's own words confirmed he had no provable claim for emotional distress continuing after the two-month unemployment period in 1999, receiving no professional[11] or medical treatment and no confirmatory

---

**11.** Although Mr. Sandler argues on reconsideration that Plaintiff's sister-in-law, Fe Guieb, testified as to various symptoms of the pain and distress Plaintiff suffered following his discharge from Pitney Bowes, Ms. Guieb also testified that she and Plaintiff were not very close and that, at the time of her deposition, she had not spoken to Mr. Alphonso in two months. (January 24, 2002 Deposition of Fe Guieb at 21–22, 28.)

testimony from family or friends, save the one excerpt of his wife's deposition testimony that Mr. Sandler had to change (as discussed above) to make it read that she believed his headaches were worse, rather than better, after he was fired by Pitney-Bowes. On balance, the Court will require Plaintiff's counsel to make reimbursement for one-half of the reasonable and necessary fees for defense counsel's services and the expert's fee; one-half of $16,853.00 yields an award of $8,426.50, arising from the vexatious pattern of assertion of post-1999 emotional distress damages.

### D. Plaintiff's Position on Edward Logan's Availability

Finally, Defendants argue that Plaintiff's position on Edward Logan's availability was taken in bad faith. This Court does not agree with this aspect of the instant motion.

Mr. Sandler knew by at least October 24, 2001, when his client stated as much at his deposition, that Mr. Logan was on permanent disability from Pitney Bowes and had serious medical issues. (See Def. Ex. AA, Alphonso Dep. Tr. at 219; Def. Ex. BB, 12/10/03 Trial Tr. at 208). For months, including at the March 11, 2003 Final Pretrial Conference with Magistrate Judge Rosen and the April 28, 2003 Settlement Conference with Judge Brotman, Mr. Sandler raised no objection to either the idea of a de bene esse deposition in general or Mr. Logan's deposition in particular. Nevertheless, on July 30, 2003, nine days before Mr. Logan's scheduled trial deposition and months after he was put on notice of Defendants' need for the deposition, Mr. Sandler first raised the issue with the Court. Mr. Sandler wrote, "Plaintiff is simply asking to see the basis for applying Fed.R.Civ.P. 32(a)(3)(C) vis-a-vis Mr. Logan, and it is respectfully submitted that Defendants be required to furnish the same prior to any deposition of Mr. Lo-

gan." (See Def. Ex. O, 7/30/03 Sandler to U.S.M.J. Donio Letter at p. 3).

At the phone conference with Magistrate Judge Donio on July 31, 2003, Mr. Sandler agreed that he would be satisfied with a declaration from one of Mr. Logan's physicians. Defendant provided such a declaration from one of Mr. Logan's physicians (Dr. Sando), to which Plaintiff's counsel objected again. (Sandler Cert. at ¶ 48). Mr. Sandler wrote Defendants' counsel, stating "we cannot agree to the trial deposition" unless Defendants provided a litany of additional information. (See Def. Ex. S, 8/4/03 Sandler to Woolf Letter).

On Magistrate Judge Donio's instruction, the deposition of Mr. Logan proceeded on August 8, 2003, without resolution of Mr. Sandler's objection to his meeting the standard of Fed.R.Civ.P. 32(a)(3)(C). (Sandler Cert. at ¶ 49). Over the course of more than 68 transcript pages, Mr. Logan gave testimony concerning his medical condition, answering every question asked concerning his condition, how it affected him, who was treating him, and how long he had been treated. Mr. Sandler preserved his objection to the sufficiency of the proofs proffered by Defendants and questioned whether Defendants had met the "illness and infirmity" threshold of Fed.R.Civ.P. 32(a)(3)(C). (Sandler Cert. at ¶ 49). Though Defendants offered, Mr. Sandler refused to take them up on their offer to reopen discovery and allow him to subpoena Mr. Logan's physicians for deposition and/or Mr. Logan's medical records. Mr. Sandler, nevertheless, continued to argue that Mr. Logan was not unavailable.

Mr. Sandler never identified any prejudice that his client would suffer as a result of Defendants' taking Mr. Logan's testimony on videotape. Plaintiff insisted, time and time again, that it was Defendants' burden to show unavailability. Defendants' counsel contend that although they

met their burden, Plaintiff's counsel refused to admit it. In his August 29, 2003 submission to Judge Donio, for example, Mr. Sandler asserted that Mr. Logan was not competent to testify about his own condition, an argument without support in the law. (*See* Def. Ex. T, 8/29/03 Sandler to U.S.M.J. Donio Letter at p. 4). When Defendants' counsel provided Mr. Sandler with controlling case law from the Third Circuit to the contrary, he simply ignored it. *See e.g., Crossley v. Lieberman,* 868 F.2d 566, 568 (3d Cir.1989)(Third Circuit rejects claim that there was insufficient evidence to establish Rule 32 unavailability because "[t]he district court found evidence of [the witness's] disability in her answers to defendant's questions on pages 15–17 of her deposition"); *Walling v. Holman,* 858 F.2d 79, 82 (2d Cir.1988)(district court properly based determination that witness was unavailable on witness's deposition testimony).

Defendants argue that Plaintiff's counsel's conduct is sanctionable. *See Alexander v. Primerica Holdings, Inc.,* 819 F.Supp. 1296, 1311 (D.N.J.1993)(ordering sanctions under 28 U.S.C. § 1927 because "[n]ot only was the law on this issue clear and consistent, but Plaintiffs have not made a good faith argument either that the law has or should be changed"); *In re TCI Ltd.,* 769 F.2d 441, 445 (7th Cir. 1985)("a lawyer engages in bad faith by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law"); *see also Kapco Mfg. Co. v. C & O Enterprises Inc.,* 886 F.2d 1485, 1496 (7th Cir.1989)(awarding sanctions in part because attorney "demonstrated an attitude of 'file, first, research later' ").

Defendants' counsel spent more than 26 hours researching, briefing, speaking to Mr. Sandler and the Logans about, and arguing orally to the Court, the issue of Mr. Logan's unavailability. These efforts cost Pitney Bowes $7,274.00 in attorneys' fees. (*See* Woolf Aff. at ¶ 8). Pitney Bowes, thus, seeks sanctions in this amount.

 Though frustrating undoubtedly to Pitney Bowes, this Court cannot say that Plaintiff's counsel's position on Edward Logan's availability was taken in wilful bad faith. At the time Mr. Sandler first raised his Fed.R.Civ.P. 32(a)(3)(C) objection, he had not yet seen the witness, heard what would become his *de bene esse* deposition testimony or received any substantive medical letter or certification. (*See* Sandler Cert. at ¶ 50). Given Mr. Logan's status as the brother-in-law of Defendant Norman Sommer, Mr. Sandler insisted upon full compliance with Fed. R.Civ.P. 32(a)(3)(C). The record does not suggest that Mr. Sandler's behavior regarding Logan's unavailability rises to the level of conduct that "multiplies the proceedings in any case unreasonably and vexatiously" as is required under 28 U.S.C. § 1927. The medical condition of Mr. Logan was a matter of reasonable factual dispute, and it was not clear-cut that a trip to the courtroom to testify was impossible. Also, by the time that this case was transferred to the undersigned's docket for trial, the prior information about Mr. Logan's health status had become somewhat stale (albeit with no indication Logan's health had improved in the meantime). Overall, the costs that Defendants incurred in providing additional certifications from Dr. Sando resulted from a determination of the Court and an adjournment of trial date, more so than any act motivated by bad faith on the part of Mr. Sandler. Thus, even though Mr. Sandler's position was non-meritorious, his objections were not undertaken in bad faith and this Court refrains from exercising its discretion to award any amount of sanctions on this issue.

E. *Reasonableness of Amounts Sought and Allocation of Sanctions Between Plaintiff's Attorneys*

■ In the opinion of this Court, the fees and costs that serve as the basis for the sanctions Defendants' counsel seek here for time spent addressing the economic damage and emotional distress claims at issue are neither exaggerated nor unnecessary. Although Plaintiff's counsel challenges the hours as unreasonable, they do not cite one time entry specifically as being inflated.

■ Nonetheless, this Court has an independent duty to satisfy itself that the defense fees requested are reasonable— *i.e.*, that they are the product of reasonable hourly rates for services that were not redundant or over-reactive to the vexatious strategies of plaintiff's counsel. This analysis of defense efforts, of course, must also appreciate the fact that defense counsel were called upon to respond to vexatious litigation tactics that multiplied the proceedings.

The hourly rates for Mr. Woolf were $245.00 in 2002 (7 years after law school graduation) and $275.00 in early 2003, rising to $295.00 after September 1, 2003, and he became a partner in the firm in 2004. (Woolf Aff. ¶¶ 2, 11, 15). The hourly rates for Ms. Levering, who is Chairperson of the firm's 240–lawyer Litigation Department, were $335.00 in 2002 and $400.00 in 2003; Ms. Levering has practiced exclusively in the area of labor and employment law and has tried numerous employment discrimination and retaliation cases in federal and state courts over her 27 years of practice. (Levering Aff. ¶¶ 2, 10). These hourly rates are reasonable for attorneys of Ms. Levering's and Mr. Woolf's respective levels of experience and skill, which were amply demonstrated at trial. The Court has detected no duplication of efforts, and indeed finds counsel have used caution in excluding time spent in consultation with one another (Woolf Aff. at ¶¶ 12, 16) as well as time spent in attending the portions of trial in which these claims were addressed and in preparing this motion for sanctions. All claimed hours were reasonable and necessary. The fees of Dr. Staller and Dr. Toborowsky also appear to have been reasonable for their retention and services as expert witnesses.

■ Furthermore, Plaintiff's counsel respond to Defendants' motion, arguing that Pitney Bowes has committed "major error" in failing to separately analyze the facts pertaining to each attorney's initiation and/or maintenance of the challenged claims. (*See* Pl. Brief in Opposition, pp. 17–18). Though Defendants state in their reply that "Plaintiff's counsel, not Pitney Bowes, know better who may be at more fault for the bad faith conduct with respect to each of the three matters at issue," (*see* Def. Reply Brief, p. 12 n. 7), Defendants set forth in their opening brief that the motion was directed "principally to Kenneth Sandler, as Plaintiff's primary counsel." (Def.Br. p. 1, n. 2). Moreover, Mr. Yaskin did not offer his assistance, which was ultimately accepted by Mr. Sandler, in trying Mr. Alphonso's case until the week of December 1, 2003. (Yaskin Cert. at ¶¶ 7, 11). It thus seems apparent to this Court that most, if not all, of the responsibility for the sanctions awarded above are to be born by Mr. Sandler. Indeed, it was Mr. Yaskin who entered the case on the eve of trial, detected the impossibility of Plaintiff's post–1999 economic and emotional damages, and abandoned them at trial, thus mitigating the already considerable harm. Accordingly, this sanction will be imposed on Mr. Sandler only, and not on Mr. Yaskin.

F. *Ability to Pay Sanction*

■ Mr. Sandler's opposition papers deny any responsibility for these sanctions,

but he has not made any assertion of the inability to pay an award, if entered. Mr. Sandler has had ample notice of the scope of the § 1927 sanctions sought and he has had an opportunity to make an appropriate showing regarding his ability to pay, *cf. Jones v. Pittsburgh National Corp., supra*, 899 F.2d at 1359 (requiring court on remand to consider issue of appellant's ability to pay). Similarly, in the context of determining the amount of Rule 11 sanctions, a district court's failure to consider ability to pay can be error, *see Doering v. Union County Bd. of Chosen Freeholders*, 857 F.2d 191, 196 (3d Cir.1988). Since Mr. Sandler had not claimed inability to pay the sanction, this court is uninformed as to his financial condition.[12]

### III. *CONCLUSION*

For the reasons discussed above, Defendants' motion for sanctions, attorneys' fees and costs, pursuant to 28 U.S.C. § 1927, will be granted in part and denied in part. Defendants' motion will be granted with respect to certain efforts to defend Mr. Alphonso's economic damage claim and emotional distress claim, and denied with respect to Plaintiff's counsels' position on the availability of Mr. Edward Logan and the taking of a *de bene esse* deposition.

This Court awards Defendant Pitney Bowes, Inc. sanctions in the total amount of $24,565.00, representing $16,138.50 for the economic damage claim and $8,426.50 for one-half of the fees incurred defending the emotional distress claim. This sum shall be paid by Kenneth A. Sandler, Esquire, within thirty (30) days hereof; no sanction is imposed upon Mr. Yaskin. The accompanying Order is entered.

**12.** Nonetheless, in an abundance of caution, in the original Opinion, the Court gave Mr. Sandler an additional opportunity to demonstrate financial inability to pay all, or some part of, this award, provided that Mr. Sandler submitted a sufficiently detailed financial affidavit and accompanying letter-brief within

### *AMENDED ORDER*

This matter having come before the Court upon the application of Defendants for sanctions, attorneys' fees and costs under 28 U.S.C. § 1927; and the Court having reviewed the submissions of the parties; and for the reasons stated in the Amended Opinion of today's date; and for good cause shown;

IT IS this 7th day of March, 2005 hereby

ORDERED that Defendants' motion for sanctions, attorneys' fees and costs [Docket Item No. 64–1] be, and hereby is, ***GRANTED IN PART AND DENIED IN PART;*** and

IT IS FURTHER ORDERED that Defendants' motion for sanctions, attorneys' fees and costs with respect to Plaintiff's claims for economic damages and emotional distress damages be, and hereby is, ***GRANTED*** as against Kenneth A. Sandler, Esquire; and

IT IS FURTHER ORDERED that Defendants' motion for sanctions, attorneys' fees and costs with respect to Plaintiff's position on the availability of Edward Logan and his *de bene esse* deposition be, and hereby is, ***DENIED;*** and

IT IS FURTHER ORDERED that Plaintiff's counsel, Kenneth A. Sandler, Esquire, shall pay to Defendant Pitney Bowes, Inc. the sum of ***$24,565.00*** for such sanctions, attorneys' fees and costs within thirty (30) days of the date of this Order.

ten (10) days thereof. The original Order provided that if Mr. Sandler did not timely submit such documentation, his opportunity to claim financial inability would be deemed waived. He has submitted no such objection based on financial inability.